```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x
ANGELO LUIS CALZADA,
                                    :
                   Plaintiff,
                                    :
            -against-
                                    :
MICHAEL J. ASTRUE,
Commissioner of Social Security,    :

                   Defendant.       :
---------------------------------x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/22/10

REPORT AND
RECOMMENDATION

09 Civ. 3926 (RJS)(MHD)

**TO THE HONORABLE RICHARD J. SULLIVAN, U.S.D.J.:**


Plaintiff Angelo Luis Calzada commenced this pro se action pursuant to section 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. § 1383(c). He seeks review of a November 28, 2008 decision by the Commissioner of the Social Security Administration (the "Commissioner" and the "SSA," respectively), denying his application for Supplemental Security Income benefits ("SSI") under the Social Security Act ("the Act"). Plaintiff contends that the decision of the Administrative Law Judge was erroneous, not supported by substantial evidence, and/or contrary to the law, and asks the court to either (a) modify the decision to grant monthly maximum SSI benefits, retroactive to the date of the initial disability, or (b) remand to the Commissioner of Social Security for reconsideration of the evidence. (Compl. at ¶ 9).

1

Defendant has moved, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings. He contends that the denial of plaintiff's application for SSI benefits is supported by substantial evidence and otherwise accords with legal requirements. Plaintiff has not responded to the motion.

For the reasons set forth below, we recommend that defendant's motion be denied and that the case be remanded for further administrative consideration.

PROCEDURAL HISTORY

On July 17, 2007,[1] Mr. Calzada protectively filed an application for SSI, claiming that back problems, arthritis, and diabetes had rendered him unable to work since April 25, 2006. (Administrative Record Transcript ("Tr.") at 67, 72). The SSA denied plaintiff's application on September 24, 2007, finding that he was "not disabled." (Tr. at 34-36). Thereafter, plaintiff augmented his initial SSI application with "Form SSA-3441" ("supplement"), a form used to document subsequent medical

---

[1] We note that the defendant's Memorandum of Law incorrectly states that August 17, 2007 was the application date. (Def.'s Mem. at 1).

developments. (Tr. at 102-108). He also filed a written request for a hearing before an Administrative Law Judge ("ALJ") on October 29, 2007. (Tr. at 10).

On October 9, 2008,[2] plaintiff appeared pro se before ALJ Wallace Tannenbaum for an evidentiary hearing. (Tr. at 21). On November 28, 2008, ALJ Tannenbaum issued a decision holding that plaintiff was not disabled under the definition of the Act. (Tr. at 10-17). Specifically, he found that while plaintiff had two severe impairments -- lumbar osteoarthritis[3] and resolved left shoulder adhesive capsulitis[4] -- "the clinical and diagnostic findings [did] not support [finding] the presence of disabling limitations." (Tr. at 13). Plaintiff sought review by the SSA Appeals Council, but his request for review was denied on January 26, 2009. (Tr. at 1-3).

---

[2] We note that plaintiff's complaint incorrectly states that March 24, 2009 was the date of his hearing. (Compl. at ¶ 7).

[3] Osteoarthritis is defined as a "noninflammatory degenerative joint disease occurring chiefly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane. It is accompanied by pain (usually before prolonged activity) and stiffness (particularly after prolonged activity)." Dorland's Illustrated Medical Dictionary 1199 (28th ed. 1994) ("Dorland's"). It is also known as "osteoarthrosis." Id.

[4] Adhesive capsulitis is defined as "adhesive inflammation between the joint capsule and the[]peripheral articular cartilage of the shoulder with obliteration of the subdeltoid bursa, characterized by painful shoulder of gradual onset, with increasing pain, stiffness, and limitation of motion." Dorland's at 261.

On March 24, 2009, after all of plaintiff's administrative remedies had been exhausted, this court's Pro Se Office received Mr. Calzada's complaint. (Compl. at 1). The complaint was filed on April 20, 2009 pursuant to 42 U.S.C. § 1383(c).[5] In support of his claim, plaintiff cites, as disabling conditions, "diabetes mellitus, high blood pressure, severe back pain, and shoulder pain." (Id.).

FACTUAL BACKGROUND

I. Non-Medical Evidence

Plaintiff was born a United States citizen on October 11, 1953. (Tr. at 54). He currently rents apartment 17H at 70 East 108th St., New York, NY 10029, where he lives alone. (Tr. at 22, 55). Plaintiff is single and has never married. (Tr. at 22, 54). He

---

[5] The Social Security Act provides aggrieved parties the right to review "by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . ." 42 U.S.C. 405(g). We note this because plaintiff's complaint is stamped as filed on April 20, 2009, which is more than sixty days after he received notice of the Appeals Council's denial of his request. Nevertheless, plaintiff's complaint was received by the Pro Se Office on March 24, 2009, which is less than sixty days from January 26, 2009 (the day plaintiff received notice of the Appeals Council's decision), and the timeliness of pro se filings is measured based on the date of receipt by the court's Pro Se Office. Toliver v. Sullivan County, 841 F.2d 41, 42 (2d Cir. 1988).

has two grown children, one living in the Bronx and the other in California. (Tr. at 27).

Plaintiff says that he is able to do his own cleaning, laundry, and cooking, although he sometimes needs help cooking and cleaning. (Tr. at 83). His daughter sometimes comes from the Bronx to help him clean and buy groceries. (Tr. at 30). He mostly stays at home and does not leave his apartment much to socialize with friends. (Tr. at 26, 31). He goes outside about three times a week. (Tr. at 83, 84). Plaintiff goes shopping once a week, which takes about an hour. (Tr. at 84). When he goes out, he uses public transportation or rides in a car. (Tr. at 30, 83). He says that he can walk about two to five blocks before stopping and resting and that it takes him an hour and a half before he can continue again. (Tr. at 29, 86). He also says that his condition prevents him from walking for a long time, from riding his bike, and from sitting down for a long time. (Tr. at 85). Although he used to enjoy fishing and baseball, he no longer engages in these activities. (Tr. at 84).

Plaintiff is not currently employed (Tr. at 23), and last held

a job between 2001 and 2003,[6] when he worked for the New York City Parks Department through a public-assistance program. (Tr. at 72-73). Plaintiff's work for the Parks Department involved maintenance, which included cleaning up leaves, collecting garbage, and maintaining the park equipment. (Tr. at 25, 73). His previous job extended from 1995 to 1996 and involved maintenance work in doctors' offices. (Tr. at 73). Plaintiff has a 9th grade education and is able to read and write, but has no vocational training. (Tr. at 23, 77). He has no trouble following instructions or getting along with other people. (Tr. at 86-87).

Plaintiff's income consists of $137.00 a month, which he receives as public assistance for rent, and may also include food stamps.[7] (Tr. at 55-56). In October 2008, plaintiff stated that he had been receiving welfare for about five years. (Tr. at 23-24).

---

[6] December 31, 2003 is the final work date recorded in the plaintiff's Disability Report (Tr. at 72), but we note that at plaintiff's hearing, the ALJ asked plaintiff whether it was correct that he had not worked since 2002 and plaintiff replied "Yes." (Tr. at 25-26). Further confusing the matter is that plaintiff claims he began working for the Municipal Parks Department in 2001 (Tr. at 73) and also that the job only lasted 11.5 months because it was part of a public assistance program. (Tr. at 72). If both of these statements are true, then plaintiff could not have worked for the Municipal Parks Department into 2003.

[7] Whether Mr. Calzada receives food stamps is unclear. Within a single document, he indicated that he receives food stamps (Tr. at 56) and then stated that he does not get help from any agency to pay for food. (Tr. at 55).

Plaintiff claims that the reason he can no longer work and the reason why he has not sought any work is because of his back pain. (Tr. at 26).

According to plaintiff, his back problems, arthritis and diabetes began to interfere with his ability to work at the beginning of 2005 and he became completely unable to work on April 25, 2006. (Tr. at 54, 72). He says that he feels "bad pain" when he lifts objects, that his legs hurt when walking and standing for long periods of time, and that his back hurts when he sits for too long. (Tr. at 85). Indeed, his back pain sometimes causes him to have to crawl out of bed in the morning. (Tr. at 72).

In an undated supplement to his application, plaintiff reported that, since his initial application, the stabbing pain in his lower back has extended to his left leg. (Tr. at 103). As for the effect of his condition upon his ability to care for himself, he wrote "[I] have difficulty bathing however [I] take my time. [I] do my things with pain." (Tr. at 106). He also stated that he began suffering from depression in August 2007, as he felt incapable of "do[ing his] things without some sort of assistance." (Tr. at 103). Plaintiff explained that depression sometimes keeps him from leaving his apartment, and that his daughter comes to help him with

7

grocery shopping and household chores. (Tr. at 106).


II. Medical Evidence


   A. Treating Sources


   On March 11, 2005,[8] plaintiff was diagnosed with new onset, Type II diabetes mellitus ("diabetes").[9] (Tr. at 167). In the course of a work-eligibility consult at North General Medical Clinic, a routine blood test revealed elevated glucose levels, prompting a referral to the Emergency Department. (Tr. at 167). The Emergency Department diagnosed plaintiff with diabetes, prescribed medication, and scheduled a follow-up appointment for later that

---

[8] Defendant mistakenly identifies this date as February 2, 2005. (See Def.'s Mem. at 3).

[9] Diabetes mellitus is defined as

> a chronic syndrome of impaired carbohydrate, protein, and fat metabolism owing to insufficient secretion of insulin or to target tissue insulin resistance. It occurs in two major forms: *insulin-dependent diabetes mellitus* (type I) and *non-insulin dependent diabetes mellitus* (type II), which differ in etiology, pathology, genetics, age of onset, and treatment. . . . [T]ype II diabetes is classically accompanied by macroangiopathy, leading to premature atheriosclerosis (myocardial infarction) and cerebrovascular accident. Both types are associated with disease of small and large blood vessels.

Dorland's at 457 (italics in original).

week. (Tr. at 116, 167). Plaintiff subsequently met with Nurse Practitioner Esther Wei ("NP Wei") of New York Presbyterian Hospital ("NY Presbyterian") several times in the next months to monitor and manage his newly-diagnosed condition. (See Tr. at 113, 138, 140).

After plaintiff's first appointment with NP Wei on December 2, 2005, Ms. Wei wrote to plaintiff informing him of the "excellent" results of his blood test. (Tr. at 113). Plaintiff's blood showed a glycohemoglobin ("HbA1C") level within the range recommended by the American Diabetes Association, and NP Wei advised plaintiff to continue with his current medications, diet, and blood glucose monitoring.[10] (Tr. at 113). At plaintiff's second follow-up appointment with NP Wei, on April 12, 2006, she noted that plaintiff's diabetes was under control and that his hypertension was "normotensive." (Tr. at 138). She also noted that plaintiff was trying to find maintenance work and included the following note in her report: "[complains of] having to sit in employment office all day; hurts his back; if he doesn't get enough food, he feels shaky;

---

[10]  NP Wei explained that HbA1C levels are used to measure the average blood glucose levels over the preceding two to three months, and that the American Diabetes Association recommends an HbA1C measurement of less than 7% to reduce the risk of diabetes-related complications. (Tr. at 113). Plaintiff's blood tests registered an HbA1C of 6.1%. (Id.).

wants letter excusing him from having to do this." (Tr. at 138).

Plaintiff returned to NY Presbyterian two weeks later, on April 25, 2006, with complaints of lower-back and bilateral shoulder pain. (Tr. at 111). Plaintiff identifies this date as the day upon which his disability commenced. (Tr. at 67). A letter prepared by the examining physician, Dr. David Gidsberg, explains that the doctor ordered x-rays of Mr. Calzada's spine and prescribed both pain medication and physical therapy.[11] (Tr. at 111). According to the radiology report prepared by Dr. Alexander Steever on April 27, 2006, the x-rays of plaintiff's spine showed "mild anterior wedging of the L1 vertebral body." (Tr. at 147). Dr. Steever observed that while the alignment and disk-space heights of the lumbar vertebrae were maintained, mild multi-level disk osteophytes[12] were discernible. (Id.). Dr. Steever concluded that plaintiff manifested "[m]ulti-level degenerative disk disease." (Id.).

---

[11] It is not clear why the record of this examination consists of only a letter addressed to "Whom It May Concern."

[12] An osteophyte is "a localized outgrowth of bone that forms at the boundary of a joint." American Medical Association, Encyclopedia of Medicine 755 (Charles B. Claymon, M.D. et al. eds., Random House 1989) ("AMA Encyclopedia"). "Osteophytes are a characteristic of osteoarthritis and are partly responsible for the deformity and restricted movement of affected joints." Id.

When plaintiff met with NP Wei on September 26, 2006 for
management of his diabetes, he reported that "everything's great"
and that he was busy looking for a job. (Tr. at 140). NP Wei noted
that plaintiff had gained weight, and found plaintiff's
hypertension to be "suboptimal." (Tr. at 140). Futhermore, while
plaintiff reported that self blood-glucose monitoring (SBGM) had
indicated that his diabetes was stable (Tr. at 140), lab tests
showed a higher HbA1C level than that measured in the previous
months.[13] (Tr. at 157). NP Wei did, however, note that plaintiff's
pain was "0/10." (Tr. at 140).


A letter by Dr. Ronac Mamtani of NY Presbyterian indicates
that plaintiff was evaluated on October 26, 2006 for "persistent
low back pain and bilateral shoulder pain." (Tr. at 94; repeated at
114). After mentioning that plaintiff's prior spinal x-ray had
indicated multi-level degenerative disk disease, Dr. Mamtani
hypothesized that "[i]t is likely that [Mr. Calzada's] shoulder
pain is from bilateral rotator cuff tendonitis."[14] (Tr. at 94, 114).
Dr. Mamtani noted that plaintiff "has been prescribed pain

---

[13] Defendant claims that "NP Wei stated that [plaintiff's]
diabetes was stable." (Mem. at 5). However, NP Wei's note actually
states: "[diabetes] stable by SBGM recall." (Tr. at 140).

[14] Tendonitis (or tendinitis) is defined as the inflammation
of tendons and of tendon-muscle attachments. Dorland's at 1667.

medication and will start physical therapy," and stated that "[Mr. Calzada] is to refrain from heavy lifting and is unable to perform work related activities." (Tr. at 94, 114).

A radiology report prepared by Dr. Erik Weiss on December 13, 2006 indicated that no fracture, dislocation, or periarticular[15] calcifications were visible in the images taken of plaintiff's left shoulder. (Tr. at 149). Dr. Weiss thus concluded that there were "no osseous or articular abnormalities of the left shoulder." (Tr. at 149).

Plaintiff returned to NY Presbyterian on January 11, 2007, again complaining of bilateral shoulder pain, with more pain in his left shoulder than his right. (Tr. at 143). The progress notes taken by Dr. Kelly state that Mr. Calzada "has not worked in several months due to the pain." (Tr. at 143). Dr. Kelly marked the second illustration on the Wong/Baker Faces Rating Scale, which represents mild pain. (Tr. at 142). Upon physical examination, Dr. Kelly made the following observations:

> [F]orward flexion of the right upper extremity to 110 degrees, abduction to 95 degrees, full external rotation, and internal rotation to T12. . . . Left shoulder shows

---

[15] Periarticular is defined as "situated around a joint." Dorland's at 1257.

12

> forward flexion of 90 degrees, abduction to 60 degrees,
> external rotation to 10 degrees, and internal rotation to
> his buttock . . . 4+/5 external rotation bilaterally
> . . . 2/5 cuff strength with the left supraspinatus and
> 5/5 with the right . . . negative cross abduction and
> negative Hawkin's bilaterally. There is obvious muscle
> atrophy in the left shoulder. The patient has positive
> tenderness over the biceps tendon in the left shoulder.

(Tr. at 143).

When bilateral x-rays showed no obvious fracture or dislocation of either shoulder, Dr. Kelly ordered magnetic resonance imaging ("MRI") scans of both shoulders to determine whether plaintiff's pain could be attributed to tendinosis,[16] tendonitis, or a tear of the rotator cuff.[17] (Tr. at 143-44). In the meantime, Dr. Kelly prescribed physical therapy with full-range-of-motion and strengthening exercises. (Tr. at 144).

The MRI taken on January 11, 2007 indicated "proliferative

---

[16] Tendinosis is defined as "[d]egenerative lesions of a tendon without inflammation or symptoms . . . . It usually progresses to inflammation (tendinitis) and, eventually, a tendon rupture." Attorney's Illustrated Medical Dictionary T:157 (West, July 2010 Supp.).

[17] The rotator cuff is "A reinforcing structure around the shoulder joint composed of four muscle tendons that merge with the fibrous capsule enclosing the joint. [] A partial tear may cause painful arc syndrome (pain when the arm is lifted in a certain arc away from the body). A complete tear seriously limits the ability to raise the arm and, in cases of severe disability, may require surgical repair." AMA Encyclopedia at 876.

changes at the acromioclavicular joint" of plaintiff's right shoulder, which pointed to mild osteoarthritis.[18] (Tr. at 150). The report prepared by Dr. Michael Schwartz also observed that "the concavity of the glenoid appears pronounced" and that there was "[a] double density at the inferior glenoid,"[19] possibly attributable to prior injury. (Tr. at 150). As to plaintiff's left shoulder, the report only states that "no radiographic evidence of acute fracture or dislocation" was found. (Tr. at 150).

On February 1, 2007, Dr. Lorich met with plaintiff to review the results of his MRI scans. (Tr. 130-31; repeated at 145-46). Dr. Lorich informed plaintiff that the MRI scan of the left shoulder demonstrated "rotator cuff tendinosis with a tiny tear at the anterior articular surface of the supraspinatus insertion"; a

---

[18] Osteoarthritis is defined as a joint disease characterized by the degeneration of the cartilage that lines joints or by the formation of bony spurs or growths in the areas surrounding the joints, all which leads to pain, stiffness, and occasionally a loss of function in the affected joint. AMA Encyclopedia at 753. The symptoms of osteoarthritis are aggravated by mechanical stress, and muscles surrounding affected joints may atrophy if pain prevents the use of the joint. Id.

[19] The glenoid cavity, also known as *cavitas glenoidalis*, id., is defined as "a depression in the lateral angle of the scapula for articulation with the humerus." Dorland's at 281. The humerus is "the bone that extends from the shoulder to the elbow articulating proximally with the scapula [shoulder blade] and distally with the radius and ulna." Id. at 779.

14

"degenerative type II SLAP tear"[20]; and "extensive thickening and high signal of the glenohumeral joint capsule."[21] (Tr. at 131).

In his progress notes, Dr. Lorich wrote that plaintiff reported no change in his symptoms and that his physical examination of plaintiff was unchanged from the prior exam conducted by Dr. Kelly on January 11, 2007. (Tr. at 131). At the same time, Dr. Lorich also marked the number "0" on the pain scale, indicating that plaintiff was experiencing no pain.[22] (Tr. at 130, repeated at 145). Although physical therapy had been prescribed to plaintiff at his prior visit, he had not yet attended a session, and Dr. Lorich urged him to do so. (Tr. at 131). Dr. Lorich wrote: "The patient was instructed that he may return to work. However, he has lower back pain being treated by another physician, I would

---

[20] A SLAP tear is a tear or lesion in the Superior Labrum from Anterior to Posterior, a part of the shoulder joint. See Stephen J. Snyder, M.D., et al., SLAP Lesions of the Shoulder. 6(4) Arthroscopy 274-79 (Dec. 1990).

[21] The term "glenohumeral" is defined as "pertaining to the glenoid cavity and the humerus." Dorland's at 698. For definitions of the glenoid cavity and the humerus, see n.19, supra.

[22] The records appear to be inconsistent. If plaintiff reported no change since his last examination in the extreme pain he was experiencing, plaintiff's pain could not be accurately described as a "0" on the pain scale. It is possible that Dr. Lorich erred in assigning that number, meaning to indicate, as before, extreme pain. In any event, the ALJ never sought an explanation for this anomaly.

defer his work capacity to that physician." (Tr. at 131).

When plaintiff returned for a follow-up appointment with Dr. Lorich on March 29, 2007, he explained that he had not been able to attend therapy due to logistical difficulties and requested a renewal of his prescription. (Tr. at 133). Plaintiff informed Dr. Lorich that the pain in his left shoulder had persisted for about a year. (Tr. at 133). Dr. Lorich's physical examination of plaintiff showed "no significant pain to lateral rotation, forward flexion or extension of the cervical spine." (Tr. at 134). Inspection of his posterior shoulder girdle demonstrated "some mild infraspinatus[23] atrophy on the right" but none on the left. (Tr. at 134). Both plaintiff's shoulders were "grossly neurovascularly intact," and palpation of the left shoulder indicated "diffuse anterior and posterior capsular tenderness." (Tr. at 134). Range-of-motion testing revealed moderate deficits of both active and passive motion in both shoulders, with the left worse than the right. Plaintiff also had positive impingement signs on both sides, with the left worse than the right. (Tr. at 134). Dr. Lorich diagnosed plaintiff with "stage II adhesive capsulitis of the left

---

[23] The infraspinatus is an "intrinsic muscle of the shoulder joint, the tendon of which contributes to the formation of the rotator cuff. Stedman's Medical Dictionary 1148 (Maureen Barlow Pugh, et al., eds., 27th ed. 2000) ("Stedman's").

shoulder with concurrent and potentially secondary impingement syndrome on the left."[24] (Tr. at 135). Dr. Lorich prescribed aggressive physical therapy and discussed the option of steroidal injections in future treatment, though plaintiff was not interested in such injections at the time. (Tr. at 135).

Plaintiff returned to NY Presbyterian Hospital on May 24, 2007 to follow up on his SLAP tear and rotator cuff tendonitis. (Tr. at 136). Plaintiff reported to Dr. Kelly that he had been going to physical therapy and that all his shoulder pain was gone. (Tr. at 136, 137). Physical examination showed full range of motion and full shoulder strength. (Tr. at 136). Dr. Kelly indicated that plaintiff had "resumed full activity with the exception of having some lower back pain." (Tr. at 136). Dr. Kelly indicated that plaintiff's shoulder pain had been resolved and that he had been referred to the physiatry clinic for evaluation of his back pain. (Tr. at 136).

In a letter dated June 26, 2007, Dr. Luise Weinstein related

---

[24] Adhesive Capsulitis is defined as "adhesive inflammation between the joint capsule and the[] peripheral articular cartilage of the shoulder with obliteration of the subdeltoid bursa, characterized by painful shoulder of gradual onset, with increasing pain, stiffness, and limitation of motion." Dorlands at 261.

that plaintiff was under the care of Cornell Internal Medicine Associates and NY Presbyterian Hospital for chronic lower-back pain and chronic shoulder pain. (Tr. at 112). Dr. Weinstein stated that plaintiff reported persistent pain from his degenerative lumbar disc disease and rotator cuff tendinitis. (Tr. at 112). Dr. Weinstein also indicated that plaintiff was scheduled for an orthopedic appointment on July 19, 2007 for further evaluation of his symptoms in the context of his request for a fair hearing. (Tr. at 112).

Several months later, after plaintiff had been examined by a consulting physician and a disability examiner and had initially been denied SSI benefits, Dr. Mamtani authored a letter summarizing plaintiff's condition. (Tr. at 161). The letter, dated January 30, 2008, stated that plaintiff was being treated for chronic lower-back pain, chronic shoulder pain, diabetes, and hypertension. (Tr. at 161). It further stated that "[plaintiff] reports that he remains in pain from his diagnoses of degenerative lumbar disc disease and rotator cuff tendinitis" and that plaintiff had already consulted an orthopedist and attended physical therapy, but "[h]is back pain remains unchanged." (Tr. at 161). Dr. Mamtani explained that he intended to investigate plaintiff's symptoms with an MRI and that plaintiff was to "refrain from heavy lifting and long

18

periods of standing." (Tr. at 161).

An MRI of plaintiff's lumbar spine, dated May 18, 2008 confirmed the earlier diagnoses of diffuse degenerative disc disease, showing diffuse disc desiccation and "small marginal osteophytes throughout the lumbar spine." (Tr. at 162; repeated at 170, 173). The MRI report prepared by Dr. Joseph Safdieh states that the MRI also revealed a "small right sided intraforaminal disc herniation abutting the exiting L4 nerve root," and minor bilateral "facet arthropathy."[25] (Tr. at 162; repeated at 170, 173).

On August 21, 2008, Drs. Halina White and David Levy completed a Treating Physician's Wellness Plan Report documenting plaintiff's health status for the New York City Human Resources Administration's Public Assistance Program. (Tr. at 163-64; repeated at 171-72, 175-76). In the section for relevant clinical findings, the doctors wrote: "severe lumbar osteoarthritis (on MRI lumbar spine)[;] hypertension[;] [and] diabetes." (Tr. at 163; repeated at 171, 175). They also noted that on examination, plaintiff "finds it very hard to walk long distances [and to] lift

---

[25] Arthropathy is "any disease affecting a joint." Stedman's at 150. A facet is "a small smooth area on a bone or other firm structure." Id. at 638.

19

heavy objects due to low back pain on movement." (Tr. at 163; repeated at 171, 175). In the section labeled "clinical course," Drs. White and Levy listed the treatment that plaintiff had tried "with no effect," including "physical therapy, lidoderm patches, Cymbalta,[26] flexoril[27], amitriptyline."[28] (Tr. at 163; repeated at 171, 175).

Drs. White and Levy concluded that plaintiff is "stable but he has severe low back pain [and] cannot walk more than 1-2 blocks and cannot lift anything heavy or turn his back." (Tr. at 164; repeated at 172, 176). They described the functional capacity of plaintiff as "[u]nable to work for at least 12 months" and specified that he is a "manual worker but his low back pain precludes him from being able to carry out his work." (Tr. at 164; repeated at 172, 176).

---

[26] Cymbalta is a trademarked brand of duloxetine -- a selective serotonin and norepinephrine reuptake inhibitor prescribed for major depressive disorder and general anxiety disorder. It is also used to treat pain and tingling caused by nerve damage in diabetics. Medline Plus, available at www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html (U.S. National Library of Medicine and National Institute of Health).

[27] Flexeril is a trademarked preparation of of cyclobenzaprine hydrochloride (Dorland's at 639), which serves as a muscle relaxant. (Dorland's at 414).

[28] Amitriptyline is a tricyclic antidepressant. (Dorland's at 59).

B. Consulting Examining Physician

   Dr. Dyana Aldea of Industrial Medicine Associates, P.C.
conducted an orthopedic examination of plaintiff on behalf of the
Division of Disability Determination on September 10, 2007. (Tr. at
119-122). Dr. Aldea first discussed plaintiff's general appearance,
gait, behavior, and station. (Tr. at 120). She stated that
plaintiff appeared to be in "no acute distress," and exhibited
normal gait and station. (Id.). Plaintiff illustrated "difficulty
walking on heels and toes" and to squat fully, he "required one
hand on the table, complaining of low back pain and decreased
balance." (Id.). Dr. Aldea reported that plaintiff used no
assistance device, he did not need help changing clothes or getting
on and off the exam table, and he was "[a]ble to rise from [a]
chair without difficulty." (Id.).

   Dr. Aldea reported no problems with respect to the fine motor
activity of plaintiff's hands or with his cervical spine. (Id.).
His hand and finger dexterity was intact, and he had a grip
strength of 5/5 bilaterally. (Id.). Similarly, he exhibited a full
range of motion in his cervical spine, with no spasms, trigger
points, or complaints of pain. (Id.).

In plaintiff's upper extremities, Dr. Aldea noted a "limited range of motion of bilateral shoulders." (Id.). The forward elevation and abduction of his bilateral shoulders was from 0 to 120 with complaint of pain. (Tr. at 120-21). His "[a]dduction and internal rotation were full, but external rotation was diminished from 0 to 45 degrees over bilateral shoulders secondary to pain." (Tr. at 121). Plaintiff exhibited a full range of motion in his elbows, forearms, wrists, and fingers bilaterally, and he showed no signs of joint inflammation, effusion, or instability. (Id.). While "[s]trength across [plaintiff's] bilateral shoulders could not be well assessed secondary to pain," his "[s]trength everywhere else was 5/5 in proximal and distal muscles." (Id.). In addition, plaintiff exhibited no muscle atrophy or sensory abnormality, and his reflexes were "physiologic and equal." (Id.).

When Dr. Aldea examined plaintiff's thoracic and lumbar spines, she found a limited range of motion. (Id.). Dr. Aldea found "[l]umbar flexion from 0 to 60 degrees, extension from 0 to 10 degrees, and lateral and rotatory movements from 0 to 20 degrees bilaterally with complaint of low back pain." (Id.). While "[t]here was mild tenderness to palpation along [the] bilateral lumbar

22

paraspinals," plaintiff had no tenderness in the SI joint[29] or sciatic notch, no spasms, no indication of scoliosis or kyphosis, and no apparent trigger points. (Id.). Furthermore, the SLR test[30] was negative bilaterally. (Id.).

Upon examination of plaintiff's lower extremities, Dr. Aldea identified only sensory limitations. (Id.). Mr. Calzada had "no sensation at all to light touch or pinprick from bilateral knees extending down to bilateral feet in a stocking distribution" and his "[r]eflexes were diminished over bilateral ankles." (Id.). However, his sensation everywhere else was normal, and he exhibited a full range of motion in his hips, knees and ankles bilaterally. (Id.). Furthermore, plaintiff exhibited full strength in proximal and distal muscles bilaterally, no muscular atrophy, and no effusion, inflammation or instability of the joints. (Id.).

Ultimately, Dr. Aldea described plaintiff's prognosis as

---

[29] The sacroiliac ("SI") joint is "the joint or articulation between the sacrum and the ilium and the ligaments associated therewith. Dorland's at 1479. The sacrum is "the triangular bone just below the lumbar vertebrae," id., and the ilium is "[t]he expansive superior portion of the hip bone[.]" Id. at 819.

[30] An SLR Test, also known as the Straight Leg Raising Test, is a physical examination technique to determine whether there exists an abnormality of the sciatic nerve. Merck Manual of Diagnosis and Therapy 325, 327 (Merck Research Labs, 18th ed. 2006).

"fair," and diagnosed plaintiff with (1) low-back pain, (2) bilateral shoulder pain, (3) bilateral shoulder tendonitis as per the claimant,[31] (4) diabetes, and (5) hypertension. (Id.). Dr. Aldea concluded that (1) plaintiff's lower-back pain created a "mild limitation" in his ability to stand, walk, bend, and squat for prolonged periods, (2) plaintiff's lower-back pain and neuropathy[32] caused a "moderate limitation" in his ability to climb for prolonged periods, and (3) plaintiff's shoulder pain caused "mild to moderate limitation" in his ability to engage in prolonged heavy lifting. (Tr. at 121-22). Dr. Aldea also concluded that plaintiff had "[n]o limitation with upper extremities for fine motor activities." (Tr. at 122).

C. Non-Physician Disability Examiner

On September 17, 2007, Disability Examiner J. Ayres conducted a Physical Residual Functional Capacity Assessment (an "RFC" Assessment) of plaintiff. (Tr. at 123-28). Ayres noted that

---

[31] Plaintiff was only diagnosed with tendonitis in one shoulder. (See Tr. at 131).

[32] Neuropathy is defined as a "functional disturbance or pathological change in the peripheral nervous system....[with] [k]nown etiologies [that] include complications of other diseases ([such as] diabet[es] or porphyri[a]) . . . ." (Dorland's at 1132).

24

plaintiff had numerous exertional limitations. First, plaintiff could occasionally lift and/or carry no more than 20 pounds. (Tr. at 124). Second, his ability to frequently lift and/or carry was limited to burdens of no more than 10 pounds. (Id.). Third, he could stand and/or walk (with normal breaks) for only six hours in an eight-hour workday. (Id.). Finally, Ayres found that plaintiff could sit (with normal breaks) for a total of about six hours in an eight-hour workday. (Id.).

Aside for the above-described limitations in plaintiff's ability to lift and/or carry, Ayres found that plaintiff had an unlimited ability to push and/or pull (as necessary for the operation of hand and/or foot controls). (Id.). Furthermore, Ayres found that plaintiff had no postural, manipulative, visual, communicative, or environmental limitations aside for the limitations upon his ability to reach in all directions (including overhead). (Tr. at 125-26).

Ayres arrived at his conclusions based upon plaintiff's complaints of bilateral shoulder and low back pain; plaintiff's medical records establishing a history of diabetes; the NY Presbyterian notes documenting approximately one year of bilateral shoulder pain; the MRI findings of rotator cuff tendonitis and a

25

degenerative type II SLAP tear; the x-ray showing degenerative disc disease; and all of Dr. Aldea's findings. (Tr. at 124).

## III. Administrative Proceedings

### A. Hearing Before ALJ

ALJ Tannenbaum held a hearing on October 9, 2008 to determine whether plaintiff was disabled within the meaning of the Social Security Act. (Tr. at 10, 21). Plaintiff appeared pro se, knowingly waiving his right to counsel, and had the opportunity to review the documentary exhibits. (Tr. at 10, 21-22).

Plaintiff informed the ALJ that he had became disabled in April of 2006, when he was 53 years old, and that the pain in his back rendered him incapable of work. (Tr. at 23-24, 26). Plaintiff testified that he had not worked, on or off the books, since his tenure at the Parks Department in 2002, and that he had been living on public assistance for five years. (Tr. at 23-26). When the ALJ asked if he had looked for a job recently, plaintiff responded that he could not work because of arthritis in his back. (Tr. at 26). The ALJ also asked plaintiff if he would take a job if one was offered to him right then, and he responded that his back hurt too

26

much. (Tr. at 28).

The ALJ asked plaintiff about his back pain. (See Tr. at 28-29). Plaintiff stated that he had experienced back pain for around two or three years and that his treatment consisted of physical therapy and an MRI.[33] (Tr. at 28). Plaintiff said that he was not undergoing physical therapy at that time and had not done so for the previous six or seven months. (Tr. at 28-29). The ALJ then asked plaintiff if he was aware that the MRI indicated that his lumbar spine was normal, and plaintiff responded "it doesn't feel normal to me." (Tr. at 29).

The ALJ also asked plaintiff about his daily activities. (See Tr. at 29-31). Plaintiff explained that he generally "take[s] it easy." (Tr. at 29). He stated that he can walk two or three blocks and cook for himself, but his daughter often comes to help him clean and do the grocery shopping. (Tr. at 29-31). Plaintiff also said that he uses public transportation when he goes out and that he does not socialize much -- he just says hello to some people when he goes downstairs from his apartment. (Tr. at 30-31).

---

[33] The ALJ failed to ask plaintiff about the prescription medications that he had listed in his application.

After confirming that there was nothing else that plaintiff thought was important for the ALJ to know, the ALJ adjourned the hearing. (Tr. at 31-32). The hearing lasted a total of nine minutes. (See Tr. at 21, 32).

B. The ALJ's Decision

In a decision dated November 28, 2008, ALJ Tannenbaum declared Mr. Calzada ineligible for SSI benefits, finding that "[Mr. Calzada] has not been under a disability within the meaning of the Social Security Act since July 17, 2007, the date the application was filed." (Tr. at 10). ALJ Tannenbaum arrived at his decision by employing the five-step evaluation process mandated by 20 C.F.R. § 416.920(a). (Tr. at 11-17).

At the first step, the ALJ found that plaintiff did not meet the disability insured status requirements of the Social Security Act. (Tr. at 12). Further, he found that plaintiff "ha[d] not engaged in substantial gainful activity" since he applied for benefits on July 17, 2007. (Id.).

At the second step, the ALJ found that plaintiff suffered from two severe impairments: lumbar osteoarthritis and resolved left-

28

shoulder adhesive capsulitis. (Id.). The ALJ designated plaintiff's diabetes mellitus and hypertension as non-severe within the definition of 20 C.F.R. § 416.921, because they placed only minimal limitations upon plaintiff's ability to work.[34] (Id.). He reasoned that plaintiff's diabetes was asymptomatic and well-controlled with medication, and that the record showed no cardiovascular, neurologic, renal or other complications arising from his hypertension. (Id.). The ALJ rejected plaintiff's claim of depression, declaring that "[t]he allegation of depression . . . is unsupported by the record as there is no evidence of any medical evaluation, clinical findings, diagnoses, or treatment relating to depression."[35] (Id.).

At the third step of the analysis, ALJ Tannenbaum moved straight into an evaluation of plaintiff's residual functional capacity ("RFC"), without first explicitly addressing whether

---

[34] A "non-severe impairment" is defined as an impairment that does not significantly limit a person's physical or mental ability to do basic work activities. 20 C.F.R. § 416.921(a).

[35] While the ALJ was correct in noting the lack of any medical records or clinical findings evidencing plaintiff's alleged depression, both plaintiff and Drs. White and Levy did indicate that he was taking prescription antidepressants. (Tr. at 105, 163 (listing Cymbalta and amitriptyline among plaintiff's medications)). This fact would suggest that the absence of any supporting evidence might be attributable to deficiencies in the administrative record rather than fabrication by plaintiff.

plaintiff's impairments met or medically equaled the criteria of an impairment listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P, thereby constituting a _per se_ disability.[36] See _Id._; see _also_ 20 C.F.R. § 416.920(a)(4)(iii). For purposes of the analysis under steps four and five, the ALJ recited that he had considered "all symptoms and the extent to which [those] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" before reaching the conclusion that petitioner had the RFC to perform the full range of "medium work."[37] (Tr. at 12, 16); see _generally_ 20 CFR 416.929; SSR 96-4p, 1996 WL 374187; SSR 96-7p, 1996 WL 374186.

At the fourth step of the analysis, the ALJ stated that he was granting plaintiff the benefit of the doubt and treated his case as

---

[36] The ALJ did not make an explicit finding at step three as to whether plaintiff's impairments were so severe as to meet or equal one of the listings of impairments. (See _generally_ Tr. at 12; 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, Appendix 1). If a claimant has a "listed" impairment, he will be considered disabled _per se_ without an additional assessment of vocational factors such as age, education, and work experience. If the plaintiff does not have a listed impairment, the Commissioner must consider whether the plaintiff still has the capacity to perform work. See, _e.g._, _Bush v. Shalala_, 94 F.3d 40, 45 (2d Cir. 1996).

[37] "Medium work" is defined as requiring, _inter alia_, "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967(c).

though plaintiff had no past relevant work, although plaintiff had performed work through the welfare department in 2002. (Tr. at 16). Thus he in effect found that plaintiff could not perform any past work, necessitating a step-five analysis.

At the fifth step, the ALJ determined that plaintff was 54 years old at the time he filed his application for benefits, and 55 years old at the time the ALJ issued his decision, which constitutes an "advanced age." (Tr. at 16); see 20 CFR 416.963. The ALJ also found that given Mr. Calzada's age, limited education, ability to communicate in English, lack of past relevant work, and an RFC to perform medium exertional work, there are a significant number of jobs that exist in the national economy that Mr. Calzada can perform. (Tr. at 16-17); see 20 CFR 416.963-69a (listing factors to consider in a disability determination). Accordingly, he found that plaintiff had not been under a "disability," as defined by the Act, at any time since the date the application was filed. (Tr. at 17).

## C. The Appeals Council Decision

The Appeals Council denied plaintiff's request for review by notice dated January 26, 2009, rendering the ALJ's decision the

31

final one on plaintiff's application for benefits. (Tr. at 1-3).


IV. <u>The Defendant's Motion</u>


   Mr. Calzada filed suit on March 24, 2009, challenging the Commissioner's decision as not supported by substantial evidence on the record and as being contrary to the law. (Compl. at 1). The Commissioner responded by filing a motion for judgment on the pleadings, arguing that his determination that plaintiff was not disabled is supported by substantial evidence. (Def.'s Mem. at 15-22).


   The Commissioner contends that the ALJ conducted a proper evaluation of plaintiff's claim pursuant to the sequential evaluation regulations and that he correctly "found that plaintiff retained the ability to perform other jobs which exist in substantial numbers in the national economy by application of the Medical Vocational Guidelines." (Def.'s Mem. at 16). The Commissioner claims that in making this determination, the ALJ gave proper weight and consideration to the opinions of the consultative examiner and treating sources. (Def.'s Mem. at 16-19). Thus, he asserts that the ALJ properly gave substantial weight to the assessment of consultative examiner Dr. Aldea. (Def.'s Mem. at 16).

In this assessment, Dr. Aldea opined that plaintiff had mild limitations in ambulation, bending, squatting, and standing for prolonged periods of time; moderate limitations in prolonged climbing; and, secondary to shoulder pain, a mild-to-moderate limitation in prolonged heavy lifting. (Def.'s Mem. at 17). According to the Commissioner, giving substantial weight to this assessment was justified by the fact that Dr. Aldea provided a detailed report of her results and that "[a] consultative examiner's opinion may serve as substantial evidence in support of an ALJ's decision." (Def.'s Mem. at 16-17, citing inter alia Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) (citing Miles v. Harris, 644 F.2d 122, 124 (2d Cir. 1981))). Defendant further suggests that the ALJ properly gave substantial weight to the opinion of Dr. Lorich, one of plaintiff's treating physicians (Def.'s Mem. at 18), who had addressed his shoulder condition and had reviewed the results of plaintiff's MRI, prescribed physical therapy, and then later indicated that, with regard to his shoulder, plaintiff "may return to work." (Def.'s Mem. at 18, citing Tr. at 130).

In the Commissioner's view, the ALJ acted properly in rejecting all other treating-source opinions. (Def.'s Mem. at 18-19). In this respect, defendant notes that the opinion of a

33

treating source may be found controlling when it has sufficient support, but if a treating-source opinion is found not to be controlling, the ALJ must explain the weight that it is given. (Def.'s Mem. at 18, citing Snell v. Apfel, 177 F.3d 128 (2d Cir. 1999); 20 C.F.R. § 416.927(d)(2); SSR 92-8p, 1992 WL 466905). Judged by these criteria, the Commissioner contends, the treating source opinions of Dr. Mamtani, Dr. White, and Dr. Levy were properly rejected "because they were not supported by objective evidence and/or were inconsistent with the record." (Def.'s Mem. at 18-19, citing Tr. at 15-16). In the case of Dr. Mamtani, the ALJ found that his opinions that plaintiff could not do heavy lifting or work-related activity, and later, that he could not do heavy lifting or prolonged standing could not be accepted because they were not supported by clinical results and because the opinion that plaintiff could not work was inconsistent with NP Wei's report that plaintiff was "great" and looking for maintenance work.[38] (Def.'s Mem. at 19, citing Tr. at 94, 138, 140, 161). As for the combined opinion of Dr. White and Dr. Levy that plaintiff could not walk more than one or two blocks and was unable to work due to a "severe" lumbar impairment, the Commissioner contends that it was

---

[38] The Commissioner notes here that while Dr. Mamtani's later opinion was rejected by the ALJ as not supported by clinical evidence, it is consistent with the opinion of Dr. Aldea. (Def.'s Mem. at 19 n.10, citing Tr. at 16, 122).

properly rejected by the ALJ because it "did not square" with the MRI report or the clinical results provided in the report. (Def.'s Mem. at 19, citing Tr. at 15-16, 163-64).

Finally, the Commissioner posits that the ALJ properly considered plaintiff's subjective complaints and determined that he could not accept them. (Def.'s Mem. at 19-21). He contends that the ALJ was correct in rejecting plaintiff's testimony that he could not work because plaintiff had reported to NP Wei that he was trying to find work. (Def.'s Mem. at 20, citing Tr. at 15, 138, 140). The Commissioner also supports the ALJ's determination not to accept plaintiff's allegations of incapacitating pain because (1) plaintiff delayed physical therapy; (2) when plaintiff finally went to physical therapy, all of his pain went away; and (3) plaintiff reported living and traveling on his own and, despite receiving occasional assistance from his daughter, he reported being able to do household chores and cooking on his own. (Def.'s Mem. at 20-21, citing Tr. at 27, 29-30, 31, 83, 84, 85, 131, 135, 136).

Based on this reasoning, the Commissioner contends that plaintiff was properly found to be capable of doing medium work. (Def.'s Mem. at 21). The Commissioner therefore concludes that considering plaintiff's RFC, age, education, and vocational

history, both the Commissioner and the ALJ correctly concluded that plaintiff was not disabled under the Medical Vocational Guidelines. (Def.'s Mem. at 22, citing 20 C.F.R. Pt. 404, Subpt. P, App. 2).

## ANALYSIS

I. Standards for Benefits Eligibility

For purposes of Social Security disability insurance benefits, one is "disabled" within the meaning of the Act, and thus entitled to benefits, when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[39] Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 641-42 (2d Cir. 1983) (quoting 42 U.S.C. § 423(d)(1)(A)). The same definition of "disabled" governs eligibility for Supplemental Security Income ("SSI") benefits. See Melville v. Apfel, 198 F.3d 45, 50 (2d Cir. 1999) (quoting 42

---

[39] Substantial gainful activity is defined as work that: "(a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, 416.910.

U.S.C. § 1382c(3)(A)). The Act additionally requires that the impairment be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004) (quoting 42 U.S.C. § 423(d)(2)(A)). Furthermore, if plaintiff can perform substantial gainful work existing in the national economy, it is immaterial, for purposes of the Act, that openings for such work may not be found in the immediate area where he lives or that a specific job vacancy may not exist. 42 U.S.C. § 423(d)(2)(A). Lastly, in assessing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988) (citing Bluvband v. Heckler, 730 F.2d 886, 891 (2d Cir. 1984), 20 C.F.R. § 416.927).

Under the SSA regulations, the Commissoner is required to evaluate disability claims under a five-step sequential process set forth in 20 C.F.R. §§ 404.1520(a)(4)(i)-(v). The Second Circuit has described this sequential process as follows:

<u>First</u>, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If not, the Secretary <u>next</u> considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the <u>third</u> inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the <u>fourth</u> inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. <u>Finally</u>, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform.

<u>Bush</u>, 94 F.3d at 44-45 (emphasis in original) (quoting <u>Rivera v. Schweiker</u>, 717 F.2d 719, 722-23 (2d Cir. 1983)).


Plaintiff bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step, that is, demonstrating the existence of jobs in the economy that plaintiff can perform. <u>See</u>, <u>e.g.</u>, <u>Poupore v. Astrue</u>, 566 F.3d 303, 306 (2d Cir. 2009); <u>Rosa v. Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999; <u>Bapp v. Bowen</u>, 802 F.2d 601, 604 (2d Cir. 1986). Normally, in meeting his burden on this fifth step, the Commissioner can rely on the Medical-Vocational guidelines contained in 20 C.F.R. Part 404,

Subpart P, App. 2, commonly referred to as "the Grids."[40] Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996). However, if the plaintiff suffers from significant non-exertional limitations,[41] exclusive reliance on the Grids is inappropriate. See Butts, 388 F.3d at 383 (citing Rosa, 168 F.3d at 78); Moulding v. Astrue, 2009 WL 3241397, *12 (S.D.N.Y. Oct. 8, 2009) (citing Bapp, 802 F.2d at 605).

---

[40] The Grids take into account the claimant's residual functional capacity in conjunction with his age, education and work experience. Based on these factors, the Grids indicate whether the claimant can engage in any other substantial gainful work that exists in the economy. Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996). The Grids classify work into five categories based on the exertional requirements of the different jobs. Specifically, they describe work as sedentary, light, medium, heavy or very heavy, based on the job requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling. Id. at 667 n.2.

[41] "An exertional limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e., sitting, standing, walking, lifting, carrying, pushing, and pulling). Rosa, 168 F.3d at 78 n.2 (citing Zorilla, 915 F. Supp. at 667 n.3). "[L]imitations or restrictions which affect [a claimant's] ability to meet the demands of jobs other than the strength demands, that is, other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered non-exertional." Samuels v. Barnhart, 2003 WL 21108321, at *11 n.14 (S.D.N.Y. May 14, 2003) (quoting 20 C.F.R. § 416.969a(a)); see also 20 C.F.R. §§ 404.1569a(c)(1)(i)-(vi).

II. Standard of Review

When a claimant challenges the SSA's denial of disability insurance or SSI benefits, a court may set aside the Commissioner's decision only if it is not supported by substantial evidence or was based on legal error. Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); see 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y., Inc. v. NLRB, 305 U.S. 197, 229 (1938)); Moran, 569 F.3d at 112 (quoting Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008). The substantial-evidence test applies not only to the Commissioner's factual findings, but also to inferences to be drawn from those facts. See, e.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999) (citing cases). In determining whether the record contains substantial evidence to support a denial of benefits, the reviewing court must consider the whole record, weighing the evidence on both sides of the question to ensure that

the claim "has been fairly evaluated." See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983)); Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).

It is the function of the Commissioner, not the courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant. Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 188 (2d Cir. 1998); Carroll, 705 F.2d at 642. While the ALJ need not resolve every conflict in the record, see Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981), "the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) (citing Treadwell v. Schweiker, 698 F.2d 137, 142 (2d Cir. 1983)). See also Snell, 177 F.3d at 134 (holding that claimant was entitled to an explanation of why the Commissioner discredited her treating physician's opinion); Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) (stating that "because the Commissioner failed to provide plaintiff with 'good reasons' for the lack of weight attributed to her treating physician's opinion . . . remand is necessary.").

In addition to considering the evidence in the record, a reviewing court must also review the ALJ's application of the law to the record before him. Even if the record, as it stands, contains substantial evidence of disability, the SSA decision may not withstand a challenge if the ALJ committed legal error. Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)).

Among the ALJ's legal obligations is the duty to adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so must address all pertinent evidence. See, e.g., Schaal, 134 F.3d at 505; Ferraris, 728 F.2d at 586-87; Allen ex rel. Allen v. Barnhart, 2006 WL 2255113, at *10 (S.D.N.Y. Aug. 4, 2006) (finding that the ALJ explained his findings with "sufficient specificity" and cited specific reasons for his decision). "'It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [his] reasoning to permit the reviewing court to judge the adequacy of [his] conclusions.'" Pacheco v. Barnhart, 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004) (quoting Rivera v. Sullivan, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991)). Courts in this Circuit have long held that an ALJ's "'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'" Kuleszo v.

Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996)).

Of particular importance, the ALJ also has an affirmative obligation to fully develop the administrative record, since a hearing on disability benefits is a non-adversarial proceeding. Burgess, 537 F.3d at 128; Melville v. Shaw, 198 F.3d 45, 51 (2d Cir. 1999) (citing Echevarria v. Sec'y of Health and Human Servs., 685 F.2d 751, 755 (2d Cir. 1982)). More specifically, the ALJ must ensure that "[t]he record as a whole [is] complete and detailed enough to allow the ALJ to determine claimant's residual functional capacity." Casino-Ortiz v. Astrue, 2007 WL 2745704, *7 (S.D.N.Y. Sept. 21, 2007) (citing 20 C.F.R. §§ 404.1513(e)(1)-(3)). To this end, the ALJ must make every reasonable effort to help an applicant get medical reports from his medical sources. 20 C.F.R. §§ 404.1512(d), 416.912(d). Furthermore, the ALJ must seek additional evidence or clarification when the "report from claimant's medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1). Thus, if a physician's finding in a report is believed to be insufficiently explained, lacking in support, or inconsistent with

43

the physician's other reports, the ALJ must seek clarification and additional information from the physician to fill any clear gaps before dismissing the doctor's opinion. See, e.g., Rosa, 168 F.3d at 79; Schaal, 134 F.3d at 505 (stating that "even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information . . . sua sponte.").

The Social Security Act authorizes a court, when reviewing decisions of the SSA, "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); Butts, 388 F.3d at 382. If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will typically remand the case for further development of the evidence or for more specific findings. Rosa, 168 F.3d at 82-83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)). "'[W]hen further findings would so plainly help to assure the proper disposition of the claim, . . . remand is particularly appropriate.'" Butts, 388 F.3d at 385 (quoting Rosa, 168 F.3d at 83). If, however, "the records provided persuasive evidence of total disability . . . any further proceedings [would be] pointless" and the court may reverse and remand solely for the calculation and payment of benefits.

Williams v. Apfel, 204 F.3d 48, 50 (2d Cir. 1999).

In sum, if the ALJ failed in his duty to fully develop the record or committed other legal error, a reviewing court

> should reverse the Commissioner's decision and remand the
> appeal from the Commissioner's denial of benefits for
> further development of the evidence. If, on the other
> hand, the [reviewing] court determines there is
> substantial evidence of disability in the administrative
> record, it may decide to reverse the Commissioner's
> decision, make a determination of disability and remand
> solely for the calculation of benefits. Such a remedy is
> an extraordinary action and is proper only when further
> development of the record would serve no purpose.

Rivera v. Barnhart, 379 F.Supp. 2d 599, 604 (S.D.N.Y. 2005).

III. Evaluation of ALJ's Decision

ALJ Tannenbaum's opinion focuses mostly upon plaintiff's RFC, which the ALJ found did not restrict plaintiff from functioning at a level commensurate with medium exertional work. We briefly describe the highlights of the ALJ's analysis.

At the third step of the evaluation, the ALJ began his analysis of plaintiff's RFC by considering "whether there [existed] an underlying medically determinable physical or mental impairment -- i.e., an impairment that can be shown by medically acceptable

45

clinical and laboratory diagnostic techniques -- that could reasonably be expected to produce plaintiff's pain and other symptoms." (Tr. at 13). The ALJ concluded that although Mr. Calzada's medical records showed a history of lumbar osteoarthritis and shoulder tendinosis, "the clinical and diagnostic findings [did] not support the presence of disabling limitations" because his shoulder tendinosis resolved within a few months of initiating physical therapy and his back condition was stable and did not restrict him from performing medium work. (Tr. at 13-14).

To justify his findings that the medical record did not support disabling limitations, ALJ Tannenbaum referred to a number of facts reflected in the record, and drew various inferences from them. (See Tr. at 13-14). The ALJ first described plaintiff's visit to Dr. Gidseg on April 25, 2006, when Dr. Gidseg examined him for complaints of lower-back pain and bilateral shoulder pain. (Tr. at 13). According to the ALJ, Dr. Gidseg prescribed pain medication, ordered an x-ray of plaintiff's spine, which showed mild degenerative disc disease, and found that plaintiff's shoulder pain was likely due to bilateral rotator cuff tendonitis.[42] (Id.).[43]

---

[42] This diagnosis was actually made on October 26, 2006 by Dr. Mamtani. (Tr. at 94; repeated at 114).

[43] The ALJ did not mention that Dr. Gidseg also prescribed physical therapy for plaintiff on April 25, 2006. (Tr. at 111).

Furthermore, the ALJ found it significant that plaintiff had indicated to NP Wei that "everything's great" and that he was busy looking for work when he visited her in September 2006. (Id.).

The ALJ then went on to state that plaintiff did not seek treatment again until January 2007, when he presented with complaints of bilateral shoulder pain. (Id.). The examination of plaintiff's left shoulder revealed tenderness, muscle atrophy, some rotator cuff tendonitis, and a degenerative tear, while examination of the right shoulder revealed minimal shoulder osteoarthritis. (Tr. at 13-14). This prompted a prescription of physical therapy, which plaintiff had not commenced by the time of his next examination in March 2007. (Tr. at 14).

The ALJ noted that, at plaintiff's March 2007 examination, plaintiff exhibited diffuse tenderness on palpation of the left shoulder, mild infraspinatus atrophy on the right shoulder girdle, moderate deficits in both active and passive motion on both shoulders and positive impingement signs on both sides. (Id.). Nevertheless, plaintiff was found to be grossly neurovascularly intact in both upper extremities and showed no biceptal tendon tenderness to palpation. (Id.). Upon being diagnosed with adhesive capsulitis of the left shoulder and potential secondary impingement

47

syndrome, plaintiff was counseled on the importance of engaging in physical therapy and was prescribed aggressive strengthening exercises. (Id.). The ALJ also observed that when plaintiff returned in May 2007, he reported that, following physical therapy, all his pain was gone except for some lower back pain and that he had resumed full activity. (Id.). Moreover, "[o]n physical examination, [Mr. Calzada] had full range of motion and full strength of the shoulders, and the record reflects a diagnosis of resolved shoulder pain." (Id.).

The ALJ also described the "minimal clinical findings" yielded from the SSA consultant's examination of plaintiff in September 2007. (Id.). Plaintiff had informed Dr. Aldea that he experienced lower-back pain and bilateral shoulder pain with an intensity of 8/10 intermittently for at least 10 hours a day. Plaintiff had also complained that his back pain radiated to his leg, leading to numbness, and that shoulder pain occurred with overhead lifting but was relieved with rest; however, upon physical examination, Dr. Aldea concluded that plaintiff was in "no acute distress." (Id.). Also among Dr. Aldea's reported findings were that plaintiff had difficulty walking on his heels and toes, that he could squat fully but with back pain and decreased balance, that he could get on and off the examination table and could rise from seated position, that

48

he had normal gait and station, that he had limited range of motion of the bilateral shoulders but no sign of joint inflammation, effusion, instability, muscle atrophy, or sensory or reflex abnormality, that he had a reduced range of motion in his lower back and mild tenderness to palpation but no spasms or trigger points, that he had limited sensation in his legs, and that plaintiff also had diminished ankle reflexes. (Id.).

Finally, the ALJ noted that an MRI from May of 2008 of plaintiff's lumbar spine revealed "minor diffuse degenerative disc disease and a small right-sided intraforaminal disc herniation at the L4-L5 level, without stenosis." (Id.).

In consideration of all this medical evidence, ALJ Tannenbaum concluded that while "claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms" (Tr. at 14), "the clinical and diagnostic findings do not support the presence of disabling limitations." (Tr. at 13).

Although the ALJ believed that the medical record did not support disabling limitations, he took heed of the fact that symptoms sometimes create impairments more severe than can be demonstrated through objective medical evidence. He thus considered

49

whether plaintiff's subjective allegations of pain and other
symptoms were credible under the standards established in Social
Security Ruling (SSR) 96-7p.[44] (Tr. at 15). The ALJ concluded "that
the [plaintiff's] subjective complaints of disabling symptoms
[could not] reasonabl[y] be accepted." (Id.). It appeared to the
ALJ that the plaintiff had stopped working not because he was
disabled but because he could not find work, which was indicated by
the fact that in September 2006, plaintiff said that everything was
great and that he was busy looking for work, and also by his
reported attempts in April 2006 at looking for work by going to the
employment office. (Id.). Another indication to the ALJ that
plaintiff's symptoms were not that severe was his "delayed
compliance with prescribed physical therapy" and the efficacy of
the physical therapy when he finally went for it for a short period
of time. (Id.). Plaintiff's treatment consisted of only physical
therapy, exercise, prescription medication, and an MRI, while
documenting degenerative disc disease of the lumbar spine, showed
"no displacement of the nerve roots, thecal sac compression, or

---

[44] These standards require an ALJ to consider the nature,
location, onset, duration, frequency, radiation, and intensity of
any pain; precipitating and aggravating factors; type, dosage,
effectiveness, and adverse side-effects of any pain medication;
treatment other than medication used for relief of pain;
functional restrictions; and the claimant's daily activities and
work record. SSR 96-7p, 1996 WL 374186.

stenosis." (Id.). Finally, looking at plaintiff's daily activities and in consideration of plaintiff's own statement, which the ALJ characterized as reflecting the resumption of full activity in May 2007, the ALJ concluded that the evidence does not demonstrate that plaintiff had severe disabilities that would preclude him from performing medium exertional work. (Id.).

In reaching this conclusion, ALJ Tannenbaum considered opinion evidence in accordance with 20 C.F.R. § 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p. (Id.). He stated that although the SSA recognizes a "treating physician" rule of deference, "no medical opinion, regardless of the source, can be adopted unless it is supported by the record as a whole." (Id.). As such, there were numerous opinions expressed by plaintiff's treating physicians that the ALJ found were not supported by the record and which "strongly suggest[ed] that these practitioners accepted the [plaintiff's] subjective complaints at face value." (Id.).

First, the ALJ addressed two letters written by Dr. Mamtani, giving them little weight. (Tr. at 15-16). Dr. Mamtani's October 2006 letter said that plaintiff could not perform any work-related activities (Tr. at 94), a finding that the ALJ stated was "unsupported by the clinical evidence, which shows only minor

51

degenerative disc disease of the spine and resolved shoulder pain."
(Tr. at 16). The ALJ further found that Dr. Mamtani's October 2006
letter was "also at odds with the [plaintiff's] statement the
previous month to the effect that he was feeling 'great' and busy
looking for work." (Id.).

The ALJ also gave little weight to Dr. Mamtani's January 2008
letter (Tr. at 16), which listed plaintiff's numerous medications,
stated that plaintiff's "back pain remains unchanged" despite
referrals for orthopedics and physical therapy, and recommended
that he "refrain from heavy lifting and long periods of standing."
(Tr. at 161). The ALJ found that the report provided no clinical
support for the latter assessment. (Tr. at 16).

Next, the ALJ gave similarly little weight to the August 2008
Treating Physician's Wellness Plan Report, completed by Dr. White
and Dr. Levy. (Id.) This report stated that plaintiff had "severe"
lumbar osteoarthritis based on an MRI of the lumbar spine, a
conclusion that the ALJ did not believe was supported by the actual
MRI report. (Id.). Drs. White and Levy also stated that plaintiff
was unable to walk more than one or two blocks, lift, or turn;
again, the ALJ's decision stated his belief that these findings
were likewise unsupported by the record. (Tr. at 16).

The ALJ did, however, give significant weight to Dr. Lorich's February 2007 treating note in regard to plaintiff's shoulder condition and Dr. Aldea's consultative examination from September 10, 2007. (Tr. at 16, 119, 130-31). The treating note said that plaintiff's "shoulder condition did not preclude him from returning to work," and the ALJ observed that this note was entered even before plaintiff had begun physical therapy. (Tr. at 16; see also Tr. at 131). The ALJ gave this report significant weight because it was "supported by the clinical record as well as the claimant's self-report." (Tr. at 16).

The ALJ also gave significant weight to Dr. Aldea's report on her consultative examination, which "found only mild limitation for prolonged standing, prolonged walking and prolonged bending and squatting, moderate limitation for prolonged climbing, and mild to moderate limitation for prolonged heavy lifting" (Tr. at 16; see also Tr. at 124). The ALJ gave this report such weight because it was "accompanied by a detailed report of a thorough physical examination," even though "claimant's lack of credibility compromises this assessment to the extent it is based on self reports of symptoms and limitations." (Tr. at 16). In light of all this evidence, the ALJ came to the conclusion that the record demonstrated that plaintiff had a residual functional capacity for

53

medium exertional work, although he cited no specific medical findings that directly supported his conclusion that plaintiff could perform such physically demanding work. (Tr. at 16).

For reasons to be noted below, we conclude that the ALJ's reasoning and the record suffer from a number of defects that justify a remand for further administrative proceedings and additional findings.

### A. The ALJ Failed to Address all the Medical Evidence and to Fully Develop the Record in Finding Plaintiff's Diabetes and Hypertension "Non-Severe"

At the second step of his analysis the ALJ found that plaintiff's diabetes and hypertension were non-severe under the definition provided by 20 CFR 416.921 et seq. We find that the ALJ's determination in this respect calls for a remand for a number of reasons.

First, the ALJ's conclusions regarding the severity of plaintiff's diabetes and hypertension were entirely conclusory and failed to address all the evidence in the record. Putting aside the fact that the last assessment of plaintiff's blood glucose levels appearing in the record was made about ten months before he filed

54

his application for SSI, NP Wei had noted at least a slight degeneration in plaintiff's condition at that time. (Tr. at 140). She had noted that plaintiff had gained weight (id.), and the blood tests that she ran indicated a higher HbA1C level than that measured in the previous months. (Tr. at 157). Contrary to defendant's representation that NP Wei had found plaintiff's diabetes to be stable (Def.'s Mem. at 5), her note indicated only that, to the best of Mr. Calzada's recollection, the blood glucose monitoring that he had been conducting himself indicated that his diabetes was stable. (Tr. at 140 (noting that "[diabetes] stable by SBGM recall.")).

Furthermore, the ALJ failed to fully develop the record in accordance with the mandate of 20 C.F.R. § 404.1512(e)(1), which requires an ALJ to "seek additional evidence or clarification from [the] medical source when a report from [that] medical source contains a conflict or ambiguity that must be resolved, [or] the report does not contain all the necessary information[.]" The last evaluation of plaintiff's diabetes and hypertension appearing in the record was made by NP Wei on September 26, 2006 -- about ten months before he filed his application for SSI, with all following medical evaluations making mention of the conditions but not measuring or assessing their status. (Tr. at 140; see Tr. at 161,

163-64 (making no mention of blood glucose testing or medical assessment of diabetic condition by Drs. Mamtani, White, or Levy)). The report produced by the consulting physician, Dr. Aldea, did not even acknowledge these diagnoses, much less reflect upon how they might impact plaintiff's ability to perform work. (Tr. at 119-122). By the time that plaintiff's file reached the ALJ for consideration, on November 28, 2008, more than two years had passed since the assessments that were reflected in the record had been made. The ALJ thus had a duty to seek updated information regarding the state of plaintiff's conditions before dismissing them as non-severe. By failing to pursue relevant, and possibly significant, information from plaintiff's treating physicians that was absent from the record, the ALJ failed to fulfill his obligation under 20 C.F.R. §§ 404.1512(d) and (e) to complete a claimant's record prior to assessing his disability claim.

Moreover, aside from failing to seek updated information on the state of plaintiff's diabetes and hypertension, the ALJ also failed to address or seek additional information regarding those observations of Dr. Aldea that were potentially relevant to the status of these conditions. Specifically, Dr. Aldea had observed that plaintiff had "no sensation at all to light touch or pinprick from bilateral knees extending down to bilateral feet in a stocking

56

distribution" and diminished reflexes over his bilateral ankles. (Tr. at 121). The neuropathy in plaintiff's lower extremities observed by Dr. Aldea is a recognized and commonly-known complication of both diabetes and hypertension, and thus potentially relevant to an assessment of the severity of either or both of these conditions. See Dorland's at 1132 (defining "diabetic neuropathy" as "most common[ly] a chronic, symmetrical sensory polyneuropathy affecting first the nerves of the lower limbs . . . ."). The ALJ's failure to address this finding or develop the record further in light of these observations therefore calls for the remand of this decision for further considerations and findings. See Shaal, 134 F.3d 505 (stating the ALJ has a duty to seek additional information sua sponte when the clinical findings are inadequate); accord Rosa, 168 F.3d at 79.

### B. The ALJ Failed to Address all the Medical Evidence and to Fully Develop the Record in Dismissing Plaintiff's Claim of Depression

In the course of evaluating the severity of plaintiff's impairments at step two, the ALJ dismissed plaintiff's claim of depression, concluding that this claim was "unsupported by the record as there [was] no evidence of any medical evaluation, clinical findings, diagnoses, or treatment related to depression or

any other mental impairment." (Tr. at 16). While the ALJ was correct in noting the lack of any medical records or clinical findings evidencing plaintiff's alleged depression, plaintiff and Drs. White and Levy did report that he was taking prescription medications used to treat depression -- namely, Cymbalta and amitriptyline. (Tr. at 105, 163 (listing Cymbalta and amitriptyline among plaintiff's medications)). This fact would suggest that the absence of any supporting evidence might be attributable to deficiencies in the administrative record rather than fabrication by plaintiff.

This omission is particularly significant because if plaintiff was suffering from some significant degree of depression, the ALJ was not permitted to rely solely on the medical-vocational guidelines (the so-called so-called grid regulations) in determining that plaintiff was not disabled. As noted, if an applicant suffers from a significant non-exertional limitation, the ALJ must assess the impact of that condition rather than mechanically invoke the grids. See Butts, 388 F.3d at 383 (citing Rosa, 168 F.3d at 78).

We therefore find that the ALJ was remiss in failing to further develop and address a clear gap in the record regarding

plaintiff's mental status or even to acknowledge the relevant evidence of plaintiff's prescribed medications. The ALJ's failure to meet his affirmative obligations in this respect constitutes legal error and requires the court to remand the case. Cf. Vega v. Astrue, 2009 WL 961930 (S.D.N.Y. Apr. 6, 2009) (remanding disability case to ALJ for further development of mental health records).

C. The ALJ Failed to Explicitly Consider Plaintiff's Lumbar Osteoarthritis and Resolved Left Shoulder Capsulitis in Relation to the List of Per Se Impairments at Step Three

At the third step of the analytic framework established by the Social Security Act, an ALJ is charged with considering whether a claimant's impairment or combination of impairments is so severe as to meet or equal one of the impairments listed in Appendix One of 20 CFR § 404.1520(a)(4)(iii). See generally 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, Appendix 1. In this case, the ALJ committed legal error by failing to make, or at least articulate, this required assessment.

The Commissioner claims that the ALJ's failure to make an explicit finding at step three constituted "harmless error" because "his evaluation of the evidence at steps four and five shows he did

not find that the evidence satisfied a Listing" and because "the record is devoid of evidence of an impairment so severe as to meet the Listings." Harmless error is not, however, the standard of review, and the relevant standard -- whether the ALJ's decision was supported by substantial evidence -- requires a remand.

In Dambrowski v. Astrue, 590 F.Supp.2d 579, 585 (S.D.N.Y. 2008), the court remanded a Social Security case because the ALJ had not adequately addressed how the claimant's impairments compared with the listed per se impairments. In that case, the ALJ had summarily declared that "none of [plaintiff's] medical impairments met the clinical requirements of any impairment in the listings without providing any further analysis or citing any medical evidence from the record." 590 F.Supp.2d at 585 (brackets in original) (internal quotation marks and citation omitted). The court found that such a conclusory statement was not adequately supported by "substantial evidence." Id.; accord Twyne ex rel. Johnson v. Barnhart, 2003 WL 22299198 at *10 (S.D.N.Y. Oct. 7, 2003) (case remanded because ALJ's minimal consideration of whether impairments were medically equivalent to any listed impairment meant that the reviewing court was "unable to determine whether his conclusions [were] supported by substantial evidence.").

60

In the cited cases, the courts found legal error because the ALJs had failed to adequately discuss the reasoning behind their conclusions that the claimants' impairments did not meet or medically equal the per se disabilities listed in Appendix 1 of 20 CFR § 404.1520(a)(4)(iii). In this case the ALJ did not even make mention of the list, much less discuss his conclusion regarding the severity of plaintiff's impairments in relation to the listed disabilities. Accordingly, the court is unable to determine whether his conclusions are supported by substantial evidence, and the case must be remanded for this reason as well.

D. The ALJ's Handling of the Treating Physician's Evidence

The SSA regulations specify that "the opinion of a claimant's treating physician as to the nature and severity of the claimant's impairments is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.' Burgess, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)) (citing cases). "[M]edically acceptable clinical and laboratory diagnostic techniques include consideration of [a] patient's report of complaints, or history, [a]s an essential diagnostic tool." Id.,

61

(quoting Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003)).

Although the treating-physician rule generally requires deference to the medical opinion of a plaintiff's treating physician, see Schisler v. Sullivan, 3 F.3d 563, 567-68 (2d Cir. 1993), the treating physician's findings need not be given controlling weight if they are inconsistent with other substantial evidence in the record, including, when appropriate, the opinions of other medical experts. Burgess, 537 F.3d at 588 (stating that "[g]enerally, the opinion of the treating physician is not afforded controlling weight where the treating physician issued opinions that are not consistent with the opinions of other medical experts) (internal quotation marks, ellipses, and citations omitted); 20 C.F.R. § 404.1527(d)(2). Indeed, the opinions even of non-examining sources may override treating sources' opinions and be given significant weight, so long as they are supported by sufficient medical evidence in the record. See, e.g., Diaz v. Shalala, 59 F.3d 307 at 313 n. 5 (2d Cir. 1995) (citing Schisler, 3 F.3d at 567-58); Pratt v. Astrue, 2008 WL 2594430, at *11 (N.D.N.Y. June 27, 2008). The findings of such consulting doctors are to be treated as opinion evidence pertinent to the nature and severity of the claimant's medical condition. 20 C.F.R. § 416.927(f). They are not

to be relied upon, however, for the ultimate determination of disability. 20 C.F.R. § 416.927(f)(2)(i).

It bears emphasis, as the Second Circuit recently observed, that "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." Burgess, 537 F.3d at 128. Notably, this category includes a consultant's opinion rendered "in terms 'so vague as to make it useless in evaluating' the claimant's [RFC]'." Id. at 129 (quoting Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000)). Similarly, the opinions of consulting physicians, whether examining or non-examining, are entitled to relatively little weight where there is strong evidence of disability in the record, Simmons v. U.S. R.R. Ret. Bd., 982 F.2d 49, 56 (2d Cir. 1992), or in cases in which the consultant did not have a complete record before him. E.g., Pratts v. Chater, 94 F.3d 34, 38 (2d Cir. 1996) (citing cases).

Morever, even if the treating physician's opinion conflicts with other medical evidence that might be considered "substantial," the ALJ must still consider various "factors" to determine how much weight, if any, to give that doctor's opinion. Among those considerations are: "the [l]ength of the treatment relationship and

63

the frequency of examination; the [n]ature and extent of the treatment relationship; the relevant evidence . . ., particularly medical signs and laboratory findings supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues." Burgess, 537 F.3d at 129 (quoting C.F.R. §§ 404.1527(d)(2)(i)-(ii), (3)-(5)); accord Halloran, 362 F.3d at 32. An ALJ must not substitute his "own assessment of the relative merits of the objective evidence and subjective complaints for that of a treating physician." Garcia v. Barnhart, 2003 WL 68040, at *7 (S.D.N.Y. Jan. 7, 2003) (citing Curry, 209 F.3d at 123).

Additionally, the regulations direct the Commissioner to "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" Burgess, 537 F.3d at 129 (quoting Halloran, 362 F.3d at 33). There must be sufficient specificity in the ALJ's articulated reasoning "to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Disarno v. Astrue, 2008 WL 1995123, at *4 (W.D.N.Y. May 6, 2008) (quoting SSR 96-2p, 1996 WL 374188 at *5). In other words, if an ALJ decides to give less than controlling weight to the claimant's treating physician, the ALJ must provide the claimant with "good reasons"

64

for making this determination. Snell, 177 F.3d at 133. "Failure to provide explicit 'good reasons' for not crediting a treating source's opinion is a ground for remand." Id. at 133 (quoting Schaal, 134 F.3d at 505; see also 20 C.F.R. § 404.1527(d)(2)).

If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician. See Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). "A treating physician's failure to include objective support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case." Fox v. Astrue, 2008 WL 828078, at *8 (N.D.N.Y. Mar. 26, 2008) (citing Rosa, 168 F.3d at 80); see also Tavarez v. Barnhart, 124 Fed. Appx. 48, 50 (2d Cir. 2008) (same); Schisler v. Heckler, 787 F.2d 76, 81 (2d Cir. 1986) (testimony of treating physician is itself presumptively reliable and does not need to be supported by objective or clinical evidence). The ALJ bears this duty as part of the requirement to "seek additional evidence or clarification from [the] medical source when a report from [that] medical source contains conflict

65

or ambiguity that must be resolved, [or] the report does not contain all the necessary information." 20 C.F.R. § 404.1512(e)(1); see Perez, 77 F.3d at 47. In short, if a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion. See, e.g., Rosa, 168 F.3d at 79 (citing Shaal, 134 F.3d 505 ("even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information ... sua sponte.")).

In this case, the ALJ committed legal error in failing develop the record or seek clarification of the treating physicians' assessments before dismissing them as inadequately supported by the clinical findings. The ALJ had a duty to make every reasonable effort to help plaintiff obtain the medical reports necessary to fill the litany of gaps in the record before him, and his failure to do so constitutes a mishandling of plaintiff's disability claim.

Among the many deficiencies in the administrative record, it is notable that a number of the medical examinations performed by plaintiff's treating physicians at NY Presbyterian over the course of his alleged disability are represented in the record only by

66

letters addressed to "whom it may concern." (See Tr. at 112 (ltr. describing exam of June 26, 2007); Tr. at 114 (ltr. describing exam of Oct. 26, 2006); Tr. at 161 (ltr. describing exam of Jan. 30, 2008)). It is not clear why these examinations are not evidenced by the kind of "progress notes" that appear in the record to evidence other instances of medical treatment by doctors at NY Presbyterian. (See, e.g., Tr. at 130-31 (record of Feb. 1, 2007 exam); Tr. at 132-33 (record of March 29, 2007 exam); Tr. at 136 (record of May 24, 2007 exam); Tr. at 142-43 (record of Jan. 11, 2007 exam)). The fact that the medical evidence in the administrative record varies between full medical reports and limited cover letters should have raised a red flag as to the record's incompleteness and triggered the ALJ's duty to supplement the record.

Notably, the ALJ dismissed the medical conclusions of Dr. Mamtani, one of plaintiff's treating physicians, because they were "unsupported by clinical evidence" (Tr. at 15), but did so without looking into whether there might exist a more particular record of the doctor's reasoning in connection with the clinical evidence or seeking a more detailed explanation from the doctor. The radiology report by Dr. Erik Weiss that appears in the record also raises questions as to potential omissions in the medical history before the ALJ. In a report produced on December 13, 2006, Dr. Weiss

67

described the results of an MRI performed on plaintiff's left shoulder (Tr. at 149), but the record does not make clear what prompted this test or who ordered it. The record includes no indication that plaintiff underwent a medical examination after the one conducted by Dr. Mamtani on October 26, 2006, but the images taken by Dr. Weiss do not appear to have been ordered by Dr. Mamtani. Dr. Mamtani makes no mention of having ordered images, the images are dated approximately six weeks after Dr. Mamtani's last recorded evaluation of plaintiff, and Dr. Mamtani's report does not indicate that he had any reason to focus his attention upon plaintiff's left shoulder since plaintiff had complained of bilateral shoulder pain. All these facts suggest that a medical examination took place between the time that Dr. Mamtani examined plaintiff in October and the time that Dr. Weiss prepared the radiology report in December, and, by extension, that plaintiff's medical history is incomplete without a record of this medical evaluation.

Another apparent deficiency in the administrative record arises in relation to the MRI report produced by Dr. Michael Shwartz on January 11, 2007. In his report, Dr. Shwartz made no mention of administering an MRI to plaintiff's left shoulder, listing only "shoulder right" under the "exam ordered." (Tr. at

150). With respect to plaintiff's left shoulder, he notes only that
"no radiographic evidence of acute fracture or dislocation" was
found, indicating that he administered an x-ray of that shoulder.
(Id.). Nevertheless, other evidence in the record suggests that an
MRI was in fact performed on plaintiff's left shoulder, presumably
by another physician whose report is missing from the record. For
one thing, the notes taken by Dr. Kelly -- on the same day that Dr.
Schwartz drew up his report -- indicate that he ordered MRI scans
of both shoulders. (Tr. at 143-44). Furthermore, on February 1,
2007, Dr. Lorich noted a meeting with plaintiff in which he
discussed the results of plaintiff's MRI scans, including
discussion of a SLAP tear in plaintiff's left shoulder -- a
diagnosis based on clinical results that do not appear in the
record. (Tr. at 130-31).


    In addition to his failure to address these gaps in the record
before concluding that the findings of plaintiff's treating
physicians were unsupported by the record, the ALJ failed to
address a significant piece of evidence in rejecting the findings
of treating physicians White and Levy. Drs. White and Levy had
described plaintiff's lumbar osteoarthritis as severe and
associated the condition with such functional limitations as an
inability to walk more than one to two blocks. The ALJ rejected

69

these findings because they "did not square with the actual MRI report" and were "not supported by the clinical findings." (Tr. at 16). As the ALJ describes it, "with no displacement of the nerve roots, thecal sac compression, or stenosis," there is no clinical support for plaintiff's claim that he suffers back pain of a debilitating magnitude. (Tr. at 15). Putting to one side the ALJ's proffered personal, lay view as to what is clinically required to support the treating doctors' findings, the ALJ finding in this respect omitted any mention of the fact that the May 18, 2008 MRI of plaintiff's lumbar spine showed, inter alia, a "small right sided intraforaminal disc herniation" abutting the nerve root that exits the L4 vertebra. (See Tr. at 162).

While an ALJ possesses the discretionary power to reject the findings of a claimant's treating physicians, he may not do so without providing explicit good reasons for doing so, and in doing so he must address all the pertinent evidence. In failing to explain why the MRI evidencing a small disc herniation in close relation to a nerve in plaintiff's lumbar spine was insufficient to support the conclusions of Drs. White and Levy, the ALJ committed a legal error that requires a remand.

E. The ALJ's assessment of plaintiff's credibility

As noted by the ALJ, when there exists conflicting evidence as to the extent of a claimant's pain, an ALJ must evaluate the claimaint's credibility. See, e.g., Snell, 177 F.3d at 135 (citing Donato v. Sec'y of Health and Human Servs., 721 F.2d 414, 418-19 (2d Cir. 1983)). An ALJ is not "required to credit [plaintiff's] testimony about the severity of [his] pain and the functional limitations it caused." Rivers v. Astrue, 280 Fed. Appx. 20, 22 (2d Cir. 2008). The weight to be assigned such testimony is within the ALJ's discretion. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); see also Snell, 177 F.3d at 135 (holding that an ALJ is in a better position to decide credibility than the Commissioner).

Nonetheless, the ALJ's discretion is not unbounded. First, throughout the five-step process, "the subjective element of [plaintiff's] pain is an important factor to be considered in determining disability." Perez v. Barnhart, 234 F. Supp 2d 336, 340 (S.D.N.Y. 2002) (quoting Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984)). Second, in assessing the claimant's testimony, the ALJ must take all pertinent evidence into consideration. See, e.g., Fox, 2008 WL 828078, at *12. Even if subjective pain is unaccompanied by positive clinical findings or other objective

71

medical evidence,[45] it may still serve as the basis for establishing disability. See, e.g., id. If the claimant's testimony as to pain is not fully supported by clinical evidence, the ALJ must consider additional factors in his assessment. Id. These include: 1) the claimant's daily activities; 2) the location, duration, frequency and intensity of symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; (6) other measures taken to relieve symptoms; and (7) any other factors concerning the individual's functional limitations due to pain or other symptoms. Id. (citing 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi)); see also Wright v. Astrue, 2008 WL 620733, at *3 (E.D.N.Y.

---

[45] Objective medical evidence is "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1529(c)(2); see also Casino-Ortiz, 2007 WL 2745704, at *11, n. 21 (citing 20 C.F.R. § 404.1529(c)(2)). Medical signs can be "anatomical, physiological, or psychological abnormalities which can be observed, apart from [claimant's symptoms]. Signs must be shown by medically acceptable clinical diagnostic techniques . . . [and] observable facts that can be medically described and evaluated." 20 C.F.R. § 404.1528(b). Laboratory findings are defined as "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (x-rays), and psychological tests." 20 C.F.R. § 404.1528(c).

Mar. 5, 2008) (listing same factors) (citing SSR 96-7p).[46] The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of her pain are consistent with the objective medical and other evidence. See Perez, 234 F.Supp.2d at 340 (finding that "the ALJ's decision to discount [p]laintiff's subjective complaints of pain is supported by substantial evidence"); Fox, 2008 WL 828078, at *12 (citing SSR 96-7p, 1996 WL 374186, at *2).

If the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, he must explain that decision "with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief" and whether his decision is supported by substantial evidence. Fox, 2008 WL 828078, at *12 (citing cases); see also 20 C.F.R. § 404.1529(c)(4). Absent these

---

[46] Social Security Ruling 96-7p states, in pertinent part, "in recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. §§ 404.1529(c) and 416.929(c) describe the kinds of evidence . . . that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements." See SSR 96-7p.

findings, remand is appropriate. <u>See</u>, <u>e.g.</u>, <u>id.</u> at *14; <u>Hardhardt</u>
<u>v. Astrue</u>, 2008 WL 2244995, at *10-11 (E.D.N.Y. May 29, 2008)
(citing <u>Schultz v. Astrue</u>, 2008 WL 728925, at *12 (N.D.N.Y. Mar.
18, 2008); <u>see also</u> <u>Knapp v. Apfel</u>, 11 F.Supp.2d 235, 238 (N.D.N.Y.
1998) ("a finding that the Commissioner has failed to specify the
basis for his conclusions is [a] compelling cause for remand.").

In this case, the ALJ concluded that "[plaintiff's] statements
concerning the intensity, persistence, and limiting effects of
[his] symptoms are not credible to the extent that they are
inconsistent with the [RFC]." (Tr. at 14). As described above,
however, the ALJ failed to consider the clinical evidence of a disc
herniation that might, in fact, have given rise to the pain
described by plaintiff. For this reason, the ALJ's assessment of
the plaintiff's credibility in light of the evidence in the record
is inherently flawed and must be remanded for additional
consideration in light of the objective evidence. On remand, the
ALJ must obtain the necessary medical evidence from plaintiff's
treating physicians and explain his reasons, if any, for
determining that this objective evidence contradicts plaintiff's
subjective allegations of disabling pain.

74

F. The ALJ's Failure to Justify His RFC Findings

As noted, the ALJ found plaintiff capable of medium exertional work, a determination that requires the conclusion that plaintiff can lift 50 pounds at a time and frequently lift or carry objects that weigh up to twenty-five pounds as well as engage in a "good deal of walking or standing". 20 C.F.R. § 416.967(c) & (b) (standards for medium work and light work respectively; regulation states that Commissioner deems applicant who is capable of medium work can also do light work). This conclusion is entirely unsupported by specific evidence in the record. Indeed, apart from the RFC findings of plaintiff's treating physicians who opined about his lower-back condition -- and who concluded that he was capable of very little perambulation and could not engage in work -- the only RFC findings are those of the non-physician disability examiner Mr. Ayers, who opined that plaintiff could occasionally lift or carry no more than 20 pounds and that he could frequently lift or carry no more than 10 pounds. (Tr. at 124). Mr. Ayers' findings are clearly inconsistent with the ability to do medium-level work. Moreover, the Commissioner's consulting physician, Dr. Aldea, noted only that plaintiff had a "mild to moderate" limitation in his ability to do heavy lifting (Tr. at 121-22), a finding that does not at all clearly support the ALJ's exertional

determination. If the ALJ was reading those findings by Dr. Aldea as implying that plaintiff was capable of the more heroic efforts that he defined, then it was surely incumbent on him not only to explain the basis for his interpretation, but to clarify with Dr. Aldea whether she concurred with the ALJ's estimates.

This gap in the record and in the ALJ's decision is of crucial importance. When applying the grid regulations, the ALJ determined that plaintiff was of advanced age (55 at the time of the hearing), that he had a limited (less than high school) education and that he lacked transferrable work skills. (Tr. at 16-17). If the ALJ had determined that plaintiff was capable of only light work -- the category  just below that of medium work, which encompasses an ability to lift not more than 20 pounds occasionally and to frequently lift and carry objects up to 10 pounds, as well as to engage in much walking and standing -- the grid regulations would have dictated a finding that plaintiff was disabled, even ignoring plaintiff's non-exertional limitations. See 20 C.F.R. § 404, Subpt. P, App. 2 at §§ 202.01-02).

In short, the ALJ's unexplained and quite possibly unjustified finding of a medium-level work capability appears to have been necessary for a denial of benefits to plaintiff. This only

76

underscores the importance of ensuring a complete record and an adequate explanation for the ALJ's reasoning, which appears inconsistent with even the consulting sources' views.

## CONCLUSION

For the foregoing reasons, we recommend that the Commissioner's decision denying SSI benefits to plaintiff should be vacated, and that the case should be remanded for further proceedings.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Richard Sullivan, Room 615, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**DATED: New York, New York**
**October 21, 2010**

RESPECTFULLY SUBMITTED,

_____

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

Copies of the foregoing Report and Recommendation have been mailed
today to:

Angelo Calzada
70 East 108th Street Apt. #17H
New York, NY 10029

Susan Colleen Branagan
United States Attorney's Office
Southern District Office
86 Chamber Street
3rd Floor
New York , NY 10007
(212) 637-2804
Fax: (212) 637-2750